IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 17-72** |
| **JUAN JARMON, et al.** | **:** | |

**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' PRETRIAL MOTIONS**

The United States of America, by its attorneys, Louis D. Lappen, Acting United States Attorney for the Eastern District of Pennsylvania, and Jerome M. Maiatico and Katayoun Copeland, Assistant United States Attorneys, hereby files its consolidated response to the defendants' pretrial motions. The defendants filed motions for discovery materials (Docs. 78, 79, 82, 92, 178, 193, 196), a motion for retention of rough notes (Doc. 80), a motion for a bill of particulars (Doc. 174), motions to suppress statements (Docs. 175, 179), motions to exclude evidence of other crimes (Docs. 181, 195), a motion to identify co-conspirator statements (Doc. 183), and a motion to dismiss the indictment (Doc. 190). For the reasons that follow, each of these motions should be denied.

## I. BACKGROUND

On February 8, 2017, a grand jury returned a 48-count Indictment charging 13 members of the JARMON/EDWARDS drug trafficking group with federal drug trafficking crimes, including conspiracy to distribute 280 grams or more of cocaine base ("crack")). In addition, various defendants were charged with substantive counts related to the charged drug trafficking conspiracy, including distribution of crack cocaine, distribution of crack cocaine in a drug-free zone (public housing), unlawful use of a communication facility in furtherance of a drug felony, and maintaining a drug house. Trial is scheduled for February 5, 2018.

The defendants charged in this case all played integral roles in the JARMON/EDWARDS DTG, a large-scale drug trafficking group that for years terrorized residents of a North Philadelphia low-income housing project. The group sold crack cocaine 24 hours a day, 7 days a week, employing a large network of supervisors, sellers, lookouts, and suppliers in and around the Norman Blumberg Apartment Complex. During the course of the conspiracy, the group supplied over $1,000,000 of crack cocaine to the streets of this neighborhood.

Defendants JUAN JARMON and DAMON EDWARDS, along with defendants EDWARD STINSON and DONTA EDWARDS, are charged as the leaders of this drug trafficking group. Among other duties, these defendants purchased bulk crack and cocaine, cooked and packaged crack cocaine into bundles, sold crack cocaine to other drug traffickers and drug users, hired, fired, and supervised shift sellers and lookouts, secured apartment space and stash locations for their members, supplied bundles of crack cocaine to shift sellers, collected drug proceeds from shift sellers, levied taxes on members and customers, and provided protection from other drug trafficking groups.

Defendants RAHEEN BUTLER, MICHAEL FERRELL, DOTTIE GOOD, TAFT HARRIS, and STEVEN THOMPSON were shift sellers for the drug trafficking group. Shift sellers were the daily workers employed by the leaders to sell crack cocaine in the locations controlled by the group. Shift sellers typically worked a day shift (8am to 4pm), evening shift (4pm to midnight), or overnight shift (midnight to 8am), sometimes selling over $2,000 of crack cocaine per shift.

Defendants STEPHEN DAWKINS, DEREK FERNANDES, ANTHONY LEE STAGGERS, and GENE WILSON were lookouts for the drug trafficking group. Lookouts assisted other members of the group by alerting them to the presence of law enforcement in the

area and at times locating, identifying, and directing customers to the shift sellers. WILSON also maintained a drug house where other defendants packaged and sold crack cocaine.

Members of the JARMON/EDWARDS DTG engaged in acts of intimidation, threats, and violence, possessed firearms and other weapons, and preyed on the financial weakness and vulnerability of persons, such as drug users and addicts, single mothers, young women, juveniles, the mentally ill, and those living in poverty, in order to further the interests of the drug trafficking group.

During the course of the investigation by the Federal Bureau of Investgation (FBI) and Drug Enforcement Administration (DEA), law enforcement conducted court-approved TIII wire intercepts of phone calls between members of the JARMON/EDWARDS DTG, which led to hundreds of relevant phone calls where members discuss their drug trafficking activities. Law enforcement also made dozens of controlled purchases of drugs from members of the drug trafficking group, using cooperating sources and undercover officers, during which the members were surveilled, audiotaped and/or videotaped by the FBI and DEA. In addition, several individuals, including customers and other sources, are cooperating with the investigation and ready to testify about the drug trafficking activities of members of this drug trafficking group, including its use of intimidation, threats, and violence.

To the extent additional background or facts pertain to specific motions, those facts appear below in the responses to those motions.

## II. RESPONSES TO PRETRIAL MOTIONS

### A. Motions for Discovery Materials

The defendants filed various boilerplate motions for discovery materials, including motions to produce discovery generally by STINSON (Doc. 78), GOOD (Doc. 92), and

JARMON (Doc. 196), a motion for early production of Jencks materials by STINSON (Doc. 79), a motion to produce exculpatory evidence by STINSON (Doc. 82), a motion to produce expert witness summaries by STINSON (Doc. 178), which was later joined by FERRELL (Doc. 191), STAGGERS (Doc. 192), and JARMON (Doc. 194), and a motion to preclude evidence not previously disclosed in discovery by JARMON (Doc. 193). These motions are meritless or moot, and each should be denied.

The government is aware of its obligations to produce information and materials pursuant to Federal Rule of Criminal Procedure 16, the Jencks Act, 18 U.S.C. § 3500, *Brady v. Maryland*, 373 U.S. 667 (1985), and *Giglio v. United States*, 405 U.S. 150 (1972). The government has made discovery available to the defendants, and the government has complied and will continue to comply with its discovery obligations. The government has also agreed to early production of Jencks and *Giglio* materials approximately two weeks in advance of trial, as well as to provide additional information relating to its expert witnesses on a continuing basis as the materials become available but no later than approximately two weeks before trial.

Discovery in a criminal case is not as broad as that permitted in a civil case. Criminal discovery is delineated by Rule 16, the Jencks Act, and constitutional requirements. *United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994). These rules have been carefully developed over years to accommodate many relevant concerns, including the faster progress of criminal trials subject to the Speedy Trial Act, the defendant's right to avoid self-incrimination, and the government's interests in protecting witnesses and the secrecy of grand jury proceedings. The government's obligations are outlined below.

<u>Rule 16</u>. The Federal Rules of Criminal Procedure require that the government disclose, upon request of the defendant, all statements made by the defendant; the defendant's prior

record; and all documents, tangible objects, and reports of examinations or tests which are material to the presentation of the defendant's defense or which the government intends to use in its case in chief. The government must also provide upon request a written summary of the testimony of its expert witnesses.

The rule expressly limits discovery to these items. Beyond the specific items described above, "this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by the attorney for the government or other government agent in connection with investigating or prosecuting the case. Nor does the rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." Fed. R. Crim. P. 16(a)(2).

<u>The Jencks Act</u>. The Jencks Act, 18 U.S.C. § 3500, requires production of certain witness statements. The Act requires the government to produce statements of any witness called at trial, after the witness' testimony on direct examination is completed. The statements subject to production are limited by the Act to substantially verbatim transcripts of a witness' utterances, or a statement which the witness has formally adopted.

<u>Exculpatory evidence</u>. In a series of cases beginning with *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court has set forth the government's constitutional obligation to provide to the defense any material in the government's possession which tends to exculpate the defendant. As explained in *Kyles v. Whitley*, 514 U.S. 419 (1995), such "*Brady* material" includes any evidence which creates a reasonable probability of a result other than conviction. *Giglio v. United States*, 405 U.S. 150 (1972) made it clear that evidence bearing on the reliability of a witness falls under the rule of *Brady*, where the "reliability of a given witness may well be determinative of guilt or innocence." *Id*. at 154.

Here, the defendants' motions in this case appear to be the functional equivalent of discovery demand letters. Defendants are not entitled to many of the items they ask for, and again, the government intends to fully comply with its discovery obligations. Nevertheless, "it is clear that a criminal defendant does not have the right to full discovery of the government's case." *United States v. Casseus*, 282 F.3d 253, 257 (3d Cir. 2002); *see, e.g., United States v. Addonizio*, 451 F.2d 49, 62 (3d Cir.1972) ("[I]n no event is the government required to divulge the identity of its witnesses in a noncapital case."). "[W]hile the *Brady* rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure." *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988). "A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [government's] files." *Pennsylvania v. Ritchie,* 480 U.S. 39, 59-60 (1987) (citations omitted). Indeed, the Supreme Court "has never held – even in the absence of a statute restricting disclosure – that a defendant alone may make the determination as to the materiality of the information. Settled practice is to the contrary." *Id.*

Some of defendants' motions seek *Giglio* material (Docs. 82, 92, 196) and again, the government intends to fully comply with its obligations. The disclosure of evidence that may be used to discredit government witnesses, however, need not be disclosed well in advance of trial. In fact, the Third Circuit has held that a district court cannot compel the government to disclose *Brady* or *Giglio* material related to its witnesses before the conclusion of their direct examination, and that ordering disclosure of such information approximately one week before the witness testified constituted an abuse of discretion. *See United States v. Higgs*, 713 F.2d 39, 44-45 (3d Cir. 1983). In *Higgs*, the court stated:

> No denial of due process occurs if *Brady* material is disclosed to [the defendant] in time for its effective use at trial . . . The *Brady* material in this case was information that [the defendant] could use on cross examination to challenge the credibility of government witnesses. For that type of material, we think [the defendant's] right to a fair trial will be fully protected if disclosure is made the day that the witness testifies. Disclosure at that time will fully allow [the defendant] to effectively use that information to challenge the veracity of the government's witnesses.

*Id*. at 448.

The government intends to produce all *Giglio* material related to its witnesses at the same time it produces the Jencks material for these witnesses, that is, approximately two weeks before trial. When considering providing these materials earlier than required, the government must consider countervailing concerns such as witness safety, which are very significant in this case. An early production two weeks before trial is more than adequate to afford defense counsel time to prepare for cross examination, to prevent unnecessary delays in the trial, and to satisfy the defendants' due process rights. *See Higgs*, 713 F.2d at 44.

STINSON and other defendants seek expert witness summaries from the government (Doc. 178, 191, 192, 194). The government provided defendants with notice that it intends to call several persons as expert witnesses at trial and provided summaries of the expected testimony in accordance with Rule 16(a)(1)(G). The government intends to provide any other information relating to its expert witnesses on a continuing basis as the materials become available but no later than approximately two weeks before trial.

JARMON asks the Court to preclude any evidence at trial not already disclosed in pretrial discovery (Doc. 193). Such a blanket order would be unreasonable and premature at this time. As described above, the government intends to produce some discovery materials, such as Jencks and *Giglio* materials, two weeks prior to trial. JARMON does not specify any particular evidence

that should be precluded from trial, nor does he provide any reasons why other less-restrictive remedies would not suffice. Indeed, the government has continuing discovery obligations. If the government produces additional materials shortly before or during trial, the Court should assess the reasons for any delayed disclosures at that time.

Because the government has provided discovery materials and acknowledges its continuing obligations under Rule 16, the Jencks Act, *Brady* and *Giglio*, it is not necessary for the Court to intervene and the defendants' motions should be denied.

**B. Motion for Retention of Rough Notes**

STINSON requests that the Court order all rough notes of the investigation taken by law enforcement officers who investigated the charges in this and related cases be retained by the government (Doc. 80). STINSON's request for an order should be denied as moot. Prior to the date of filing this motion, the government instructed the case agent to remind all agents to maintain copies of rough notes of interviews, to the extent that such notes exist, and to direct other law enforcement personnel to preserve existing notes once they are identified as prospective trial witnesses.

Rough notes of interviews are subject to production only if they constitute statements falling under the Jencks Act, or contain *Brady* material. *United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994). In *Ramos*, the Third Circuit reaffirmed its prior directive that the government preserve all notes of interviews with witnesses in criminal cases. However, it explained that this rule exists only to permit prosecutors and then, if necessary, trial judges to review the notes to assure that no Jencks or *Brady* material is present in the notes. If no such material exists in the notes, the notes are not produced to the defense.

Indeed, it is the rare case in which rough notes from interviews amount to a Jencks statement. The Jencks Act states a very limited and exclusive definition of the class of "statements" that must be produced. They are:

> (1) a written statement made by said witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

The Jencks Act's major concern is with limiting defense access to government materials. *Palermo v. United States*, 360 U.S. 343, 354 (1959); *United States v. Nathan*, 816 F.2d 230, 236 (6th Cir. 1987) ("One purpose of the Jencks Act is to prevent 'the undiscriminating production of agent's summaries of interviews regardless of their character or completeness.'") (*quoting Palermo*, 360 U.S. at 350).

The key limitation is that only statements that represent the witness' own words, either because they were written or adopted by him, or because they are "substantially verbatim" transcripts, are to be produced. *See* 18 U.S.C. § 3500(e)(2). "[I]t was felt to be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be seen to be the witness's own rather than the product of the investigator's selections, interpretations, and interpolations." *Palermo*, 360 U.S. at 350; *see also Goldberg v. United States*, 425 U.S. 94, 127-28 (1976) (Powell, J., concurring) (because trial testimony rarely conforms precisely to what a witness has said earlier, it is unfair to question the witness regarding any earlier statement that is not unquestionably his).

Thus, rough notes of interviews rarely qualify as Jencks statements. To fall under subsection (e)(1), they must be adopted by the witness. *See Government of Virgin Islands v. Lovell*, 410 F.2d 307, 310 (3d Cir. 1969); *see also United States v. Williams*, 962 F.2d 1218, 1224 (6th Cir. 1992) (holding that an agent's interview notes must be produced only when "notes from the interview were read back to and verified by the witness and if the report summarized the notes without material variation."). "This requirement clearly is not met when the lawyer [or agent] does not read back, or the witness does not read, what the lawyer [or agent] has written." *Goldberg v. United States*, 425 U.S. 94, 110 n.19 (1976).

Rough notes of interviews also hardly ever qualify as "substantially verbatim" statements under subsection (e)(2). "Typical interview notes are selective – even episodic – and therefore fall outside of subsection (e)(2)." *Goldberg*, 425 U.S. at 126; *see United States v. Braggs*, 23 F.3d 1047, 1051 (6th Cir. 1994) (holding there was no Jencks violation where government did not produce agent's rough notes recording incomplete information from a phone call with witness). Even where brief, precise quotations are included, that is "inadequate to qualify the notes as Jencks material." *United States v. Gross*, 961 F.2d 1097, 1105 (3d Cir. 1992).

Here, the government has already produced, or intends to produce, the typewritten reports prepared by the agents based on their rough notes from witness interviews, in accordance with its obligations under the Jencks Act, *Brady*, and *Giglio*.[1]

[1] The government routinely produces typewritten reports prepared by agents based on their interview notes. While it is the practice of the United States Attorney's Office in this district to produce such reports (known as Reports of Interview, ATF 3120's, FBI 302's, DEA 6's, and the like) to the defense before trial, it must be recognized that this practice also is not required by law. Courts have held unanimously that interview reports such as those prepared here are not Jencks material. *See, e.g.*, *United States v. Allegrucci*, 299 F.2d 811, 813 (3d Cir. 1962); *United States v. Starusko*, 729 F.2d 256, 263 (3d Cir. 1984); *United States v. Foley*, 871 F.2d 235, 238-39 (1st Cir. 1989) (FBI 302's were not Jencks statements, where they plainly were

**C. Motion for Bill of Particulars**

STAGGERS seeks a bill of particulars claiming that "the Indictment does not adequately apprise [him] of the precise nature of the charges against him," (Doc. 174). He is incorrect and his motion should be denied. The Indictment is a lengthy speaking indictment that places STAGGERS well on notice as to the crimes with which he is charged. Count One charges STAGGERS with conspiracy to distribute crack cocaine, and it contains a specific date range, the manner and means of the conspiracy, the roles of STAGGERS and others in the conspiracy, and overt acts in furtherance of the conspiracy, including two acts in which STAGGERS himself is identified as a "lookout" by co-conspirators. Indeed, the Indictment specifically defines STAGGERS alleged role as a "lookout," stating that he assisted other members of the drug trafficking group by alerting them to the presence of law enforcement in the area, sometimes referred to as "protecting the building," and at times locating, identifying, and directing customers to the shift sellers who sold crack cocaine.

Additionally, the government has provided discovery materials in this case and acknowledges its continuing obligations to provide materials thereby negating the need for a bill of particulars. Much of the information relevant to STAGGERS' requests is contained within the Indictment itself (detailing the timeframe of the conspiracy and roles of the defendants) and the discovery already provided. A portion of the information relating to STAGGERS' involvement in the charged conspiracy will come from the testimony of co-conspirators. Reports have been prepared for each of the cooperating co-conspirators as well as others who will testify in this case

---

not substantially verbatim; it is irrelevant that the agent was a "punctilious" note taker who often asked the witness to slow down, and read portions back to the witness to assure that the notes were correct); *United States v. Ricks*, 817 F.2d 692, 697-98 (11th Cir. 1987); *United States v. Paden*, 787 F.2d 1071, 1077-78 (6th Cir. 1986); *United States v. Claiborne*, 765 F.2d 784, 801 (9th Cir. 1985); *United States v. Edwards*, 702 F.2d 529, 531 (5th Cir. 1983).

and some of these witnesses have testified before the grand jury. These reports and grand jury testimony detail the information provided by the cooperating coconspirators and witnesses and provide the framework for their testimony at trial. As described above, the government intends to provide these and all Jencks materials approximately two weeks prior to trial.

Under modern-day discovery rules, especially where, as here, there is a "speaking indictment," bills of particulars are largely unnecessary. As the Third Circuit stated in *United States v. Urban*, 404 F.3d 754 (3d Cir. 2005), in affirming the denial of a motion for bill of particulars:

> The purpose of a bill of particulars is 'to inform the defendant of the nature of the charges brought against him, to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense.' *Addonizio,* 451 F.2d at 63-64. Only where an indictment fails to perform these functions, and thereby 'significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial[,]' *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir.1989) (citing *Addonizio*, 451 F.2d at 62-63), will we find that a bill of particulars should have been issued. As discussed above, the indictment provided more than enough information to allow Appellants to prepare an effective trial strategy. Moreover, Appellants had access through discovery to the documents and witness statements relied upon by the government in constructing its case, including trial evidence reflecting the dates of payments to Appellants and the approximate amounts of those payments. This access to discovery further weakens the case for a bill of particulars here. *See United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir.1979) ("Full discovery ... obviates the need for a bill of particulars.").

*Id.* at 771-72.

It is axiomatic that a bill of particulars may not be used merely as a discovery device to acquire evidentiary details of the government's case or its theories, *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985), particularly in a case such as this where all available details have been disclosed. As in *Urban*, the Indictment "provides more than enough information" to allow STAGGERS to prepare an effective trial strategy and his access to voluminous discovery "further

weakens the case for a bill of particulars." *Urban*, 404 F.3d at 771-72 (citations omitted). The government refers STAGGERS to the Indictment itself, the previously provided materials and to the additional law enforcement reports and grand jury testimony of various witnesses, which will be turned over prior to trial. A bill of particulars is unnecessary and STAGGERS' motion should be denied.

**D. Motions to Suppress Statements**

DAWKINS (Doc. 175) and STINSON (Doc. 179) argue that statements they provided law enforcement should be suppressed because their constitutional rights were violated. They are wrong. Law enforcement protected the rights of both defendants when they voluntarily chose to make statements.

**1. DAWKINS' Motion to Suppress Statements**

DAWKINS filed a motion to suppress a post-*Miranda* statement he made on the day of his arrest, arguing that he was unable to waive his rights due to his crack cocaine use (Doc. 175). His argument is meritless. DAWKINS' reported drug use did not render his *Miranda* waiver or his statement involuntary. Without coercive police activity, a statement will not be deemed involuntary. *Colorado v. Connelly*, 479 U.S. 157, 163 (1986). Because DAWKINS does not even allege any police misconduct or overreaching, his drug use is irrelevant to the determination of voluntariness.

Moreover, the facts belie any argument that his statement was involuntary and that he did not understand his rights.[2] Before speaking to DAWKINS on the day of his arrest, agents transported him to an interview room and offered him food, drink, and an opportunity to use the

[2] These facts are based in part on the video and audio recording of DAWKINS' statement, as well as the expected testimony of Special Agents from the FBI.

bathroom. Agents explained the nature of the charges and read his *Miranda* rights to him, and DAWKINS acknowledged and said he understood those rights. DAWKINS was alert and responsive. He did not complain that he was sick, tired, or that his faculties were otherwise impaired. He expressed concerns about his family's safety and asked that those concerns be addressed before speaking to agents. DAWKINS' concerns confirmed an understanding of his rights and his reasoned thought process. The agents stopped questioning and left the room. A few minutes later, DAWKINS knocked on the door and, unprompted, requested to speak with the agents again. When agents began to remind him of his rights, DAWKINS said, "I know my rights." He expressed a willingness to speak to the agents as long as any safety concerns would be addressed. DAWKINS then proceeded to give rational, coherent, and responsive answers to the questions asked. He managed to recall in significant detail names, dates, and locations relating to the drug trafficking groups in which he was a member. The interview lasted less than 30 minutes. Near the end of the interview when asked if he had used any drugs within the last 24 hours, DAWKINS said he had used "coke" the day before. DAWKINS did not mention any lingering effects from his reported drug use the day before. Again, DAWKINS was alert and responsive during the entire interview, and he never complained that he was sick, tired, or that his faculties were otherwise impaired. Accordingly, DAWKINS' *Miranda* waiver and statements were voluntary, knowing, and intelligent.

A defendant may waive his *Miranda* rights, provided that his waiver is voluntary, knowing, and intelligent. The analysis of whether a waiver is voluntary is made under the Due Process Clause of the Fifth Amendment. *Connelly*, 479 U.S. at 163. According to the Supreme Court, the inquiry has two dimensions. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than

intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421-22 (1986). The government must prove the waiver of a defendant's *Miranda* rights by a preponderance of the evidence. *Connelly*, 479 U.S. at 168.

As noted above, courts look to whether there was police coercion to effectuate the waiver. As the Supreme Court stated in *Connelly*, "coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause." *Id*. at 167. In *Connelly*, the defendant (who told police that he had previously been hospitalized for mental illness) waived his *Miranda* rights and confessed to a murder, but later claimed that his confession was involuntary because he was in a psychotic state and only confessed because he was following the voice of God" commanding him to do so. The Supreme Court held that "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal of due process of law." *Connelly*, 479 U.S. at 164 (footnote omitted). As the Court explained,

> [W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry. Moreover, suppressing respondent's statements would serve absolutely no purpose in enforcing constitutional guarantees. ... Only if we were to establish a brand new constitutional right the right of a criminal defendant to confess to his crime only when totally rational and properly motivated -- could respondent's present claim be sustained.

*Id*. at 165.

Police coercion is not often found. Thus, the use of trickery by the police does not usually make a confession involuntary. *See, e.g., Frazier v. Cupp*, 394 U.S. 731, 739 (1969). Instead, coercion has historically required truly outrageous police conduct, such as beating the defendant,

*Brown v. Mississippi*, 297 U.S. 278 (1936), or depriving the defendant of food and holding him in a "sweat box," *Brooks v. Florida*, 389 U.S. 413 (1967). There are no such allegations in this case.

Instead, DAWKINS claims that his will was overborne, not by any conduct of the police, but by his own ingestion of crack cocaine. However, a defendant's mental condition does not by itself determine the issue of voluntariness. *Connelly*, 479 U.S. at 165 ("[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion," the police must still overreach and exploit the known and existing condition); *see United States v. Montgomery*, 14 F.3d 1189, 1195 (7th Cir. 1994) ("Even if we were to assume that [defendant] was a cocaine addict who may have been incapacitated, we would not necessarily conclude that the statement was involuntary because there still must be some showing of official coercion."). As there is no allegation here of police misconduct, there can be no finding of involuntariness.

In any event, DAWKINS' waiver was knowing and intelligent, despite his ingestion of drugs the day before he spoke with police. Following *Connelly*, a number of courts have held that intoxication does not automatically render a waiver of rights involuntary. For example, in *United States v. Palmer*, 203 F.3d 55, 60-61 (1st Cir. 2000), the Court found a valid waiver despite the defendant's heroin withdrawal and use of antidepressants, where the record showed that on the night of his arrest, the defendant stated that his mind was working properly and that he understood his rights and his waiver of his rights; "the defendant's tone, clarity and detailed recall of the robberies as set forth in the confession supported a finding of lucidity;" and, although the transcript of the confession indicates that the defendant felt discomfort because of the effects of the withdrawal, the detective testified that the defendant appeared clear-headed. *See also United States v. Andrews*, 231 Fed. App'x 174, 177 (3d Cir. 2007) (valid waiver despite

defendant's smoking marijuana or ingesting Xanax thirteen hours prior to confessing);*United States v. Rodriguez-Rodriguez*, 364 F.3d 1142, 1146 (9th Cir, 2004) (valid waiver despite defendant's heroin withdrawal); *United States v. Walker*, 272 F.3d 407, 412-13 (7th Cir. 2001) (valid waiver despite defendant's vomiting three times during interrogation, due to effects of heroin withdrawal); *United States v. Byrne*, 83 F.3d 984, 989 (8th Cir. 1996) (valid waiver despite evidence that defendant was under the influence of methadone at time of interview); *United States v. Magness*, 69 F.3d 872, 874 (8th Cir. 1995) (valid waiver despite evidence that defendant had taken four to five times his prescribed dosage of anti-anxiety medication before and after his arrest, where defendant's responses were clear and coherent); *United States v. Kelle*, 953 F.2d 562, 565-66 (9th Cir. 1992) (valid waiver despite defendant's heroin withdrawal, where although defendant began to exhibit physical signs of withdrawal he remained coherent and oriented); *United States v. Jones*, No. 95-1608, 1997 WL 441795, at *6 (6th Cir. 1997) (valid waiver despite defendant's having informed police of his consumption of $400 worth of crack and two pints of whiskey earlier in the day).

Courts have routinely upheld as voluntary and intelligent waivers given by suspects who had ingested far more drugs than DAWKINS. For example, in *United States v. Brooks*, 125 F.3d 484, 491 (7th Cir. 1997), the Seventh Circuit found that the defendant's waiver was valid, although the defendant had been on a virtual crack cocaine smoking "bender" for approximately two months, had not slept in the four days leading up to his arrest, and had accidentally shot himself in the hand with a shotgun when arrested, requiring a local anesthetic and stitches. In finding the waiver valid, the Court noted that the FBI agent had testified that the defendant was wide awake, coherent, and alert, that he spoke clearly, never complained of great pain and was given aspirin upon request, and that the defendant had said that he was feeling only the "after

effects" of the cocaine. Finally, the Court noted that, even if the defendant were in the condition that he later claimed, the agents did not capitalize on that condition in obtaining the waiver.

Likewise, in *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990), the Eighth Circuit found a valid waiver although the defendant had not slept during the five days leading up to his arrest, due to his heavy use of methamphetamine. *See also United States v. Reynolds*, 367 F.3d 294, 299 (5th Cir. 2004) (valid waiver despite defendant's lack of sleep and methamphetamine use one hour before arrest); *Shackleford v. Hubbard*, 234 F.3d 1072, 1080-81 (9th Cir. 2000) (waiver valid because defendant was "articulate and responsive to questions" despite defendant's recent cocaine use, fatigue, and mental deficiencies); *United States v. Korn*, 138 F.3d 1239, 1240 (8th Cir. 1998) (valid waiver despite defendant's allegedly being under the influence of drugs and exhausted).

In a factually distinguishable case, the Supreme Court has held that statements obtained by the police from an individual suffering from severe depression and "unbearable" pain in the intensive care unit of a hospital were not voluntary. *Mincey v. Arizona*, 437 U.S 385 (1978). However, various courts have held that even defendants who have suffered serious injury or medical problems, who are heavily medicated and interviewed while still confined to a hospital bed, can provide valid waivers of their rights. For example, in *United States v. George*, 987 F.2d 1428, 1430-31 (9th Cir. 1993), the Ninth Circuit found the defendant's waiver valid, even though the defendant suffered an accidental heroin overdose after failing in his attempt to smuggle the drug inside balloons concealed inside his stomach, and was interviewed while still confined to a hospital bed, on medication, in critical condition, and in pain.

Even a waiver obtained from a defendant who had been involved in a shootout with the police, and had sustained serious gunshot injuries requiring emergency surgery and strong

painkiller medication, was found to be valid, where it could be shown that the defendant understood his rights and was alert and responsive during the interview. *United States v. Pagan*, 984 F.2d 61, 62 (2nd Cir. 1993). *See also United States v. Cristobal*, 293 F.3d 134 (4th Cir. 2002) (valid waiver despite fact that defendant was hospitalized with multiple gunshot wounds, and was under the influence of painkillers and narcotics); *United States v. Morris*, 287 F.3d 985 (10th Cir. 2002) (valid waiver despite fact that defendant was hospitalized with two gunshot wounds and was under the influence of pain medication at time of interview).

DAWKINS presents a quite insubstantial basis for finding involuntariness, let alone that the police exploited his condition to secure an involuntary confession. His cursory motion does not show otherwise. Here, despite DAWKINS claim that he used "coke" the day before, he was able to understand and answer questions asked of him and never complained that he felt unwell. DAWKINS did not exhibit any signs of intoxication that would render his statements involuntary. DAWKINS' initial request that agents address safety concerns before continuing the interview demonstrated his ability to comprehend and act on the agent's instruction that he had a right to stop the interview at any time. His memory was intact as shown by his ability to recall in significant detail facts about the drug trafficking groups in which he was a member. His detailed statement was, quite simply, the product of a man who clearly understood the situation he was in and was fully aware of what was happening.

For all these reasons, DAWKINS' motion to suppress his statement should be denied.

**2. STINSON's Motion to Suppress Statements**

STINSON filed a motion to suppress statements he made on March 30, 2015, following his arrest on a probation violation, and statements he made on February 16, 2017, the day of his arrest in this case (Doc. 179). At this time, the government does not intend to introduce at trial

any of STINSON's statements from March 30, 2015, so that request should be denied as moot. STINSON challenges the post-*Miranda* statements made on February 16, 2017, by claiming in a conclusory fashion that the government cannot establish that he waived his *Miranda* rights. He cites no facts and makes no argument regarding how or why the waiver was invalid. *See United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making a prima facie showing of illegality. Reliance on vague, conclusory allegations is insufficient.").

Nevertheless, STINSON made a voluntary, knowing, and intelligent waiver of his *Miranda* rights before making statements on February 16, 2017. As noted above, because STINSON makes no allegation here of police misconduct, there can be no finding of involuntariness. *See Connelly*, 479 U.S. at 167. Before speaking to STINSON on the day of his arrest, agents transported him to an interview room and offered him food, drink, and an opportunity to use the bathroom. Agents advised STINSON of his *Miranda* rights by reading to him verbatim from the FBI's advice of rights form. He acknowledged that he understood his rights and agreed to be interviewed. This waiver was audio and video recorded, and agents memorialized the waiver in a written report. The circumstances of his interview did not provide any reason to think that the waiver was involuntary. STINSON was alert and responsive. He was questioned shortly after his arrest, he did not complain that any of his faculties were impaired, and he does not allege coercion or intimidation. Moreover, STINSON was familiar with his rights and understood the significance of the waiver, given his numerous prior contacts with the criminal justice system. *See United States v. Pruden*, 398 F.3d 241, 246-47 (3d Cir. 2005) (noting that a defendant's familiarity with the criminal justice system is a factor suggesting that

the defendant understood the significance and validity of his waiver). Accordingly, STINSON's waiver was valid, and his motion to suppress his statements should be denied.

**E. Motions to Exclude Evidence of Other Crimes**

STINSON (Doc. 181) and JARMON (Doc. 195) filed motions to exclude evidence of other crimes pursuant to Federal Rule of Evidence 404(b). STINSON's motion was joined by FARRELL (Doc. 191), STAGGERS (Doc. 192), and JARMON (Doc. 194). Neither STINSON nor JARMON specify which "other crimes" they seek to exclude. STINSON merely asserts that "any evidence" from a separate indictment (Crim No. 17-71) should be excluded. JARMON asks that evidence of "other unindicted bad acts" be excluded.[3] These vague assertions do not provide a basis to exclude evidence of other crimes and should otherwise be denied as moot.

Rule 404(b) provides:

> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:
>
> (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
>
> (B) do so before trial — or during trial if the court, for good cause, excuses lack of pretrial notice.

Rule 404(b) applies to evidence of wrongful acts which are "extrinsic" to the charged offense. Evidence which is "intrinsic" does not fall within the rule. *United States v. Green,* 617 F.3d 233, 245 (3d Cir. 2010). Here, the government does not intend to present evidence that is

---

[3] JARMON also asks that his prior criminal history be excluded. As of this date, the government does not intend to offer any evidence of JARMON's criminal history pursuant to Rule 404(b).

extrinsic; instead, all of the evidence that the government intends to offer at trial is intrinsic to the charged offenses.

An important distinction must be drawn here. While the defense may believe that certain acts and statements are subject to 404(b), the government believes that these same acts and statements are intrinsic to the charged offenses alleged in the indictment, as the acts and statements directly prove the charged offenses and/or occurred contemporaneously with the charged offenses and facilitated the commission of the offenses. Therefore, the evidence is admissible without regard to 404(b).

In *United States v. Green*, 617 F.3d 233, 245 (3d Cir. 2010), the Court explained that the "intrinsic" label is reserved "for two narrow categories of evidence." *Id.* at 248. "First, evidence is intrinsic if it 'directly proves' the charged offense." *Id.* (citations omitted). "Second, 'uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime.'" *Id.* at 249 (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). "[A]ll else must be analyzed under Rule 404(b)." *Green*, 617 F.3d at 249. Here, all of the evidence that the government intends to offer at trial will go directly toward proving the existence of the charged conspiracy, each defendant's role in that conspiracy, the acts they committed in furtherance of and to facilitate that conspiracy, as well as statements made during the course of and in furtherance of that conspiracy, and as proof of each of the substantive offenses.

In this regard, it is appropriate to consider the Court's decision in *United States v. Gibbs*, 190 F.3d 188 (3d Cir. 1999), which approved the admission of evidence as intrinsic (and which *Green* cited as an example of such a result). Gibbs was one of the leaders of a cocaine distribution conspiracy. The government introduced evidence that, when Gibbs suspected that a person aimed

to kidnap him, he dispatched two aides to attempt to kill that person; and that on another occasion, when Gibbs believed that an erstwhile co-conspirator, Sydnor, shot him, he delegated two other workers to kill Sydnor. The Third Circuit approved the admission of the evidence as intrinsic, not subject to Rule 404(b), because the indictment in the case alleged that Gibbs and others used acts of violence to protect his position as the leader of the conspiracy. *Id.* at 216. "Since the government introduced evidence of Gibbs's use of violence to further the illegal objectives of the cocaine conspiracy by removing threats to himself (since threats to Gibbs meant threats to the trafficking enterprise), the District Court did not abuse its discretion in permitting this evidence to come in." *Id.* at 218. *Gibbs* is directly on point with this case.

Thus, where proof of an act directly proves a material allegation of the indictment, the evidence will likely be viewed as intrinsic. *See also United States v. Hoffecker*, 530 F.3d 137, 189-90 (3d Cir. 2008) (evidence that a defendant charged with commodities fraud had been given a lifetime ban on trading in precious metals, and therefore situated his venture outside the U.S., was intrinsic to the fraud and thus not subject to Rule 404(b)). In *Green*, the Third Circuit emphasized:

> There is little practical difference between admitting inextricably intertwined evidence as "background" pursuant to Rules 401 and 402, and admitting it under Rule 404(b). In both cases, the evidence must be relevant, it must pass muster under Rule 403, and it must not be introduced solely to prove the defendant's criminal propensity. "[T]he only consequences of labeling evidence 'intrinsic' are to relieve the prosecution of Rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction upon defense counsel's request."

*Green*, 617 F.3d at 247 (quoting *Bowie,* 232 F.3d at 927). Thus, even if the Court determines that certain evidence is not intrinsic and that 404(b) is applicable, the evidence is nonetheless

admissible pursuant to 404(b). To this extent, the government relies upon Rule 404(b) to support the admission of this evidence.[4]

So once again, any evidence offered by the government at trial will go directly to proving that STINSON participated in, and is guilty of the charged offenses in this case.

**F. Motion to Identify Co-Conspirator Statements**

STINSON requests that the Court order the government to identify specific recordings that the government intends to introduce at trial pursuant to Federal Rule of Evidence 801(d)(2)(E) (Doc. 183). This motion was later joined by other defendants (Docs. 191, 192, 194). The defendants have been provided with copies of all audio and video recordings and transcripts that the government will seek to use at trial.[5] At trial, the government will offer into evidence audio and video recordings, including recordings of defendants and co-conspirators lawfully intercepted pursuant to applications made and orders issued under 18 U.S.C. § 2518, recordings of prison calls between defendants and co-conspirators, and consensually monitored recordings between cooperating witnesses and defendants and/or co-conspirators. The government will move to display transcripts of the conversations to the jury, which can be admitted either as substantive evidence, or simply as an aid to the jury to be used at the time the recordings are played in Court. The

---

[4] The Supreme Court has held that evidence is admissible under Fed. R. Evid. 404(b) when the following requirements are satisfied: (1) a proper evidentiary purpose; (2) relevance under Fed. R. Evid. 402; (3) a weighing of the probative value of the evidence against its prejudicial effect under Fed. R. Evid. 403; and (4) a limiting instruction concerning the purpose for which the evidence may be used. *See United States v. Console*, 13 F.3d 641, 659 (3d Cir. 1993), *citing Huddleston v. United States*, 485 U.S. 681, 691-92 (1988). The government acknowledges its continuing duty to disclose Rule 404(b) evidence as it is recognized as such and to show good cause if it fails to provide pretrial notice.

[5] The government reserves the right to provide additional transcripts if necessary and/or to play recordings at trial without transcripts.

Indictment provides a roadmap to over 100 relevant recordings that the government intends to introduce. The government has filed a motion *in limine* to admit recordings in advance of trial and intends identify all of those recordings prior to the hearing on that motion. Thus, at this time, STINSON's motion is premature and should be denied.

**G. Motion to Dismiss Indictment**

STAGGERS asks the Court to dismiss the Indictment against him for lack of specificity, arguing that he has not been adequately informed of the charges (Doc. 190). This is similar to his argument for a bill of particulars, and again, STAGGERS is wrong and his motion should be denied.

An indictment must contain only a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient so long as it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007) (quotation marks and citation omitted). Generally, an indictment satisfies these requirements where it informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time period during which the violations occurred. *United States v. Urban*, 404 F.3d 754, 771 (3d Cir.2005); *see also United States v. McCarty*, 862 F.2d 143, 144, 148 (7th Cir.1988) (finding indictment under 18 U.S.C. § 922(g) sufficient where it tracked the statutory language, stated the date and place of the alleged possession, and specifically identified the type of firearm involved).

Further, “no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution.” *United States v. Kemp*, 500 F.3d at 280 (quotation marks and citation omitted); *accord Hamling v. United States*, 418 U.S. 87, 117 (1974) (similar standard under Constitutional requirements); *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989). As the Supreme Court recently explained:

> [T]he Federal Rules were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure. While detailed allegations might well have been required under common-law pleading rules, they surely are not contemplated by [Rule 7(c)(1)].

*United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (quotation marks and citations omitted). Thus, “[a]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, *if valid on its face*, is enough to call for trial of the charge on the merits.” *United States v. Vitillo*, 490 F.3d 314, 320 (3d Cir. 2007) (emphasis in original) (quotation marks and citation omitted).

In determining the sufficiency of an indictment, a district court must accept as true the factual allegations set forth in the indictment. *United States v. Huet*, 665 F.3d 588, 594-95 (3d Cir. 2010) (citing *United States v. Sampson*, 371 U.S. 75, 78–79, (1962)); *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990). As there is no criminal corollary to the civil summary judgment mechanism, *United States v. Huet*, 665 F.3d at 595, a motion to dismiss is not an appropriate vehicle for challenging the sufficiency of the government’s evidence. *United States v. DeLaurentis*, 230 F.3d 659, 660-61 (3d Cir. 2000). Rather, “[t]he government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal.” *Id.*

Indeed, only in rare circumstances will an indictment fail to adequately state an offense. For instance, dismissal is appropriate only "if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002). This occurs, for example, where a statute penalizes assaults on a rape victim but the indictment alleges assault only on a male companion of the rape victim, *Gov't of Virgin Islands v. Greenidge,* 600 F.2d 437, 438-40 (3d Cir. 1979).

That is not the case here. The facts alleged in the Indictment, if proven beyond a reasonable doubt at trial, will establish that STAGGERS conspired to distribute crack cocaine. Count One informs STAGGERS of the statute under which he is charged, lists the elements of a violation under the statute, and specifies the time period during which the violation occurred. No greater specificity is required. Moreover, it describes STAGGERS' specific role in the conspiracy as a "lookout" that assisted other members of the drug trafficking group by alerting them to the presence of law enforcement and directing customers to the shift sellers who sold crack cocaine. Thus, STAGGERS' motion to dismiss is meritless.

## III. CONCLUSION

For all these reasons, each of the defendants' motions should be denied.

Respectfully submitted,

LOUIS D. LAPPEN
Acting United States Attorney

/s/ Jerome M. Maiatico
JEROME M. MAIATICO
KATAYOUN COPELAND
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2017, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

/s Jerome M. Maiatico
JEROME M. MAIATICO
Assistant United States Attorney